STATE EX REL. KROPF, Plaintiff in error, vs. GILBERT, Sheriff, Defendant in error.

STATE EX REL. FARNESS, Plaintiff in error, vs. GILBERT, Sheriff, Defendant in error.

STATE EX REL. ROGERS, Plaintiff in error, vs. GILBERT, Sheriff, Defendant in error.

*October 14—December 5, 1933.*

For the plaintiffs in error Kropf and Farness there was a brief by *Curkeet, Lewis & Sanborn* of Madison, and oral argument by *William R. Curkeet.*

For the plaintiff in error Rogers there was a brief by *McGovern, Curtis & Devos* of Milwaukee, attorneys, and *H. H. Thomas* of Madison of counsel, and oral argument by *Mr. Thomas.*

*Fred Risser,* district attorney of Dane county, and *A. W. Kopp* of Platteville, special prosecutor, for the defendant in error.

FRITZ, J.  Upon a complaint which was filed by the district attorney of Dane county in the superior court of that county, and which charged the plaintiffs in error, R. R. Kropf, R. H. Farness, and A. T. Rogers, and others, with the commission of certain criminal offenses, warrants were issued for their arrest.  Upon a preliminary examination, that court determined that the evidence submitted in that examination disclosed that criminal offenses had been committed, as charged in certain of the counts of the complaint, and that the plaintiffs in error and Joseph M. Boyd are probably guilty as to those offenses; and therefore held them for trial in the circuit court for Dane county on those counts, and required them to give bond for their appearance.  Thereafter the place of trial was duly changed to the circuit court for Columbia county.  The plaintiffs in error declined to give bail.  Instead, each filed a petition in the circuit court for Columbia county for a writ of *habeas corpus,* to which the

respondent in error made return, setting up the proceedings had and the process by virtue of which he detained the plaintiffs in error. The latter demurred to the return, and the matter came on for argument upon the record. Upon the hearing, the trial court quashed the writs of *habeas corpus* and held the plaintiffs in error for appearance at the then term of the circuit court for Columbia county. From that order the plaintiffs in error appeal.

Upon *habeas corpus* proceedings to test the legality of the detention of a petitioner imprisoned under a commitment issued pursuant to the determination of an examining magistrate, after a preliminary examination, the sole issue presented is whether or not the evidence introduced on the preliminary examination established the commission of the crime charged, and a reasonable probability of the commission thereof by the defendants. The reviewing court—

"can examine the evidence only sufficiently to discover whether there was any substantial ground for the exercise of judgment by the committing magistrate. It cannot go beyond that and weigh the evidence. It can say whether the complaint will admit of a construction charging a criminal offense, or whether the evidence rendered the charge against the prisoner within reasonable probabilities. That is all. When it has discovered that there was competent evidence for the judicial mind of the examining magistrate to act upon in determining the existence of the essential facts, it has reached the limit of its jurisdiction on that point. If the examining magistrate acts without evidence, he exceeds his jurisdiction; but any act, upon evidence worthy of consideration in any aspect, is as well within his jurisdiction when he decides wrong as when he decides right." *State ex rel. Durner v. Huegin,* 110 Wis. 189, 237, 85 N. W. 1046; *Vejih v. Redford,* 182 Wis. 311, 314, 196 N. W. 228; *Lundstrum v. State,* 140 Wis. 141, 144, 121 N. W. 883.

The counts in the complaint upon which the plaintiffs in error were held for trial charged them with criminally aiding and abetting the fraudulent conversion and embezzlement by Joseph M. Boyd, at specified times during the course of two

years, of bonds and money of the aggregate value of $231,800, which were the property of the Beecroft Building Company, and the disbursement and safe-keeping of which had been intrusted to Joseph M. Boyd. In that complaint plaintiffs in error were also charged with three violations of the Blue Sky Law. As far as the particular offenses charged in that complaint are concerned it must be noted that under sec. 355.17, Stats., a district attorney, in filing an information, is not restricted to the crime stated in the complaint made before the examining magistrate, but that he may file an information setting forth the crime committed according to the facts ascertained on such examination, whether it be the offense charged in the complaint upon which the examination was had or not. *Dahlgren v. State,* 163 Wis. 141, 157 N. W. 531; *Bianchi v. State,* 169 Wis. 75, 171 N. W. 639; *Faull v. State,* 178 Wis. 66, 189 N. W. 274. Consequently the evidence on the preliminary examination must be deemed sufficient to warrant holding the plaintiffs in error for trial if it admits of finding the existence of the essential facts to constitute any criminal offense, although it was not charged in the complaint.

The evidence submitted on the preliminary examination involved in the cases at bar, when construed most favorably, as it must be to determine whether there was any substantial basis for the exercise of the judgment of the committing magistrate, admits of finding the following facts: In 1928 William G. Beecroft and his family, through a corporation known as the Beecroft Building Company (hereinafter called the Beecroft Company), owned three theater properties in the city of Madison, known as the Parkway, Strand, and Orpheum. Prior to June 1, 1928, there were outstanding a lien against the Parkway of $100,000, a $280,000 bond issue against the Parkway and Strand, and a remainder of $395,000 of bonds issued against the Orpheum. The Joseph M. Boyd Company (hereinafter called the Boyd

Company), an investment house, had previously financed the Parkway and Strand loans. The bonds secured by the Orpheum (which will hereafter be referred to as Orpheum 1sts) had been sold through the Central Trust Company of Illinois.

In the summer of 1928 William G. Beecroft, as president of the Beecroft Company, entered into negotiations with the Boyd Company to refinance the incumbrances on those properties so as to refund the outstanding bond issues and supply additional capital. Those negotiations resulted in a written proposal made by the Boyd Company to the Beecroft Company, which, excepting for provisions (here not material) as to the nature of the security, interest rate, insurance, collection of rents, and distribution of excess earnings, is as follows:

"Dear Doctor Beecroft:

"We submit the following proposition for the first and refunding mortgage loan upon your three properties, namely, the Strand Theater, the Parkway Theater, and the new Orpheum Theater, for your consideration.

"Amount: $925,000 or such amount as the Railroad Commission will pass as a Class A security. Our Mr. Rogers to be your attorney in this matter, and secure the permit for us. The bonds to be in denominations of $100, $300, $500, and $1,000.

$395,000 Balance due on the Central Trust Company mortgage.

$280,000 Balance due on the Mifflin Realty Company mortgage.

$100,000 Balance due on the Mifflin Realty Company collateral loan.

$100,000 To cover present floating indebtedness.

$50,000 Our fee for refinancing.

$925,000 Total.

"Note: This does not include the cost of refinancing the $395,000 mortgage now held by the Central Trust Company, or such amount as may remain of that loan at the time of taking it up. We reserve the right to take up this mortgage

upon any interest date, according to the provisions of the trust deed, at our option, at an agreed price of one-half of one per cent. for each year that the bond issue is to run.

· · · · · · · · · · ·

"Maturities: Inasmuch as the mortgage to the Central Trust Company of Illinois now provides for the payment of $20,000 per annum upon your loan, we will not require any payments upon the principal of our mortgage for a period of five years. After which time, the maturities shall be $10,000 per year, payable to us. It is agreed that if the first mortgage to the Central Trust Company is taken up by us before maturity, that our loan is automatically to call for $10,000 to be paid each six months. The balance unpaid upon this mortgage is to become due and payable on June first, 1938.

"Redemption privilege: After the first year, upon sixty days' prior notice, bonds may be redeemed in part or in full on any interest date upon payment of face and accrued interest.

"Permit: Borrower to secure a Class A permit from the Securities Division of the Railroad Commission, the expense of which the Boyd Company will pay.

"Underwriting: For our fee for refunding the $100,000 of seven per cent. bonds and the $280,000 of first-mortgage bonds, and the additional $100,000 to cover your floating indebtedness, our charge is to be as stated above $50,000. There will be no charge for trusteeship, nor for keeping the monthly payment account, and it is agreed that in any event one-twelfth of the total annual interest charge, taxes, insurance and current principal payments shall be deposited monthly with the trustee. You are to pay only for the revenue stamps, recording fees, abstract charges, and for the bonds.

"Responsibility of trustee: The trustee takes no responsibility as to collecting of rents, it being expressly agreed that the borrower shall be responsible for the payments as required by the terms of the trust deed. . . .

· · · · · · · · · · · ·

"Yours very truly,
"JOSEPH M. BOYD, President.
"Accepted this 4th day of June, 1928.
"W. G. BEECROFT."

After that contract was signed, the Boyd Company, in its own name, made an application for the issuance of a permit by the Railroad Commission of Wisconsin for the sale of the bonds. That application was signed, "The Joseph M. Boyd Company, by Alfred T. Rogers, Vice-President, R. R. Kropf, Secretary." After investigations, appraisals, etc., the Railroad Commission classified the securities as Class A and issued a permit on November 13, 1928, for their sale. In the meantime a trust indenture prepared by Rogers, pursuant to the understanding between the companies that the attorney of the Boyd Company should act in that capacity, was executed by the Beecroft Company and recorded. The amount of bonds authorized under the permit by the Railroad Commission was $900,000, and the trust indenture provided for the execution of bonds of different denominations in that total amount. In the trust indenture the mortgagor warranted that the title was free and clear of liens and incumbrances except one trust deed held by the Central Trust Company of Illinois to secure a bond issue of $425,000, which was reduced by payments to $395,000.

Article IX of the trust indenture, relating to the execution and authentication of the bonds by the trustee, is as follows:

"Section 1. The bonds to be secured hereby shall be executed by the President and by the Secretary of the Company and delivered for authentication to Joseph M. Boyd, Trustee, and thereupon, as provided in this Article and not otherwise, the said Joseph M. Boyd, Trustee, shall authenticate and deliver the same to the order of the President and Secretary of said Company, provided that the Trustee shall retain in his possession an amount, par value, of the bonds secured by this Trust Indenture which shall always equal the amount, par value, of any unpaid bonds secured by the Trust Indenture to the Central Trust Company of Illinois dated December 1, 1925 and above particularly described. If and when the remaining bonds outstanding to the Central Trust Company of Illinois, are paid, and the Trust Indenture securing the same duly satisfied of record, then the Trustee shall forthwith authenticate and deliver to the order of the President

and the Secretary of the Company, an amount of the Bonds secured by this Trust Indenture, equal, par value, to the amount, par value, of bonds secured by the Trust Indenture to the Central Trust Company of Illinois, which are duly called and paid at the time of the satisfaction of the trust indenture to the Central Trust Company of Illinois.

"In the event that bonds to the Central Trust Company of Illinois are paid from time to time thus reducing the amount outstanding from the present amount of Three Hundred Ninety-five Thousand ($395,000.00) Dollars, the Trustee hereunder shall cancel and retire from time to time an amount or amounts of the bonds secured by this Trust Indenture equal to the Bonds to the Central Trust Company of Illinois so paid.

"Bonds Not Valid Until Authenticated Matured Coupons to be Detached.

"Section 2. The amount of all the bonds which may be issued under this Indenture is limited so that the aggregate principal sum thereof shall not exceed Nine Hundred Thousand ($900,000.00) Dollars. No one of said bonds shall be deemed issued or valid until the same shall have been authenticated by the signature of the said Joseph M. Boyd, and Trustee's certificate indorsed on said bond and such authentication upon any such bond shall be conclusive evidence that the bond so authenticated has been duly issued hereunder, and that the holder thereof is entitled to the benefit of the trust hereby created. Before authentication or delivery of any bond, all coupons thereon then matured shall be cut off and canceled and delivered to the said Company.

"Maturities, Numbers and Denominations.

"Section 3. All of said bonds shall be issued and dated June 1, 1928, and numbered, of denominations and maturities as follows: . . ."

Before commencing to sell any of the bonds secured by the trust indenture of June 1, 1928, they were separated into two packages. One package contained bonds of the par value of $505,000, and the other contained bonds of the value of $395,000. They were all put in one box, which was placed in the vault of the Joseph M. Boyd Company.

By October 22, 1928, bonds to the amount of $505,000, being the remainder of the bonds after deducting the amount of the Orpheum 1sts held in Chicago, had been purchased by the Boyd Company, which proceeded to dispose of those bonds to purchasers; and that $505,000 block was exhausted at the end of April, 1929. Neither the bonds in that block of bonds, nor the proceeds thereof, were wrongfully converted. Realizing that the $505,000 block was being exhausted by sales, the Boyd Company negotiated with the Beecroft Company for a release of the remaining $395,000 bonds, which were being withheld under the terms of the trust indenture to retire the Orpheum 1sts, held by Chicago parties. Under article IX of the trust indenture the trustee was not to authenticate and deliver those bonds totaling $395,000 until the remaining bonds outstanding under the trust deed to the Central Trust Company were paid. Until those bonds were paid and that trust deed was released, the bonds issued pursuant to the terms of the trust indenture of June 1, 1928, to Joseph M. Boyd as trustee, were second, and not first mortgage bonds. On the letterhead of the Boyd Company, under date of March 12, 1929, the following letter was written:

"Mr. William K. Otis, Trust Officer, Central Trust Company of Illinois, Chicago, Illinois.

"Dear Mr. Otis: As agreed with you upon last Friday, we hereby agree to take up and pay for the $385,000 of bonds held by your company and issued by the Beecroft Building Company secured upon the Orpheum Theater property of this city on or before December 21, 1929.

"These bonds are to be delivered to us as you take them in from your clients, and we are to pay for them at call price, plus accrued interest. We trust it will be agreeable to you to accept payment for the June first maturities at par and interest as it is so near their maturity date, and Doctor Beecroft will expect this of us. We shall hope that you can deliver them not faster than $50,000 per month, $25,000 every two weeks. When notified of the number of bonds

which you hold, we will remit you in Chicago funds and you will then present the bonds to your trustee for cancellation and either advise us that they are canceled or send the bonds to us, whereupon we will be at liberty to issue an equal amount of bonds from our bonds of the new issue.

"Will you kindly advise us if this is in accordance with your understanding of our conversation?

"Very cordially yours,

"JOSEPH M. BOYD,

J.B.:S.B.                                    "President."

Statements of account rendered by the Boyd Company to the Beecroft Company disclose that under date of June 1, 1928, the Beecroft Company was credited with the $505,000 bond issue, and that commencing March 21, 1929, there were some credits for "additional bonds." Apparently, as bonds were bought in by the Central Trust Company, they were forwarded to the Boyd Company and the Boyd Company thereupon considered as authenticated an equivalent amount of the bonds secured by the trust indenture of June 1, 1928. The last entry for "additional bonds" to the credit of the Beecroft Company is under date of May 8, 1931, $10,000. The total amount so credited to the Beecroft Company account for additional bonds amounted to approximately $63,000. It appears from the bond register kept by the Boyd Company that these items were credited to bonds on hand, but that on and after April 22, 1929, sales were made from the $395,000 block, although no equivalent amount of the Orpheum 1sts had been theretofore retired. That constituted what is known in the evidence as the oversale or sale of bonds not authorized under the terms of the trust indenture, nor by the arrangement entered into on March 12, 1929. Sales continued to be made down to March 12, 1931, at which time the oversale amounted to $226,600 according to the bond register. As these oversales were being made the Beecroft Company was not given credit therefor in the statements of account rendered to it by the

Boyd Company. In fact as bonds of the unauthorized issue were sold through the Boyd Company, the proceeds of such sales went into the treasury of the Boyd Company and were disbursed by that company for its own purposes in the general course of its corporate business, so that when the crash came, the proceeds of the unauthorized sale had been converted to the use of the Boyd Company without the knowledge or consent of the Beecroft Company. W. G. Beecroft testified that the first knowledge which he had of the sale of unauthorized bonds was on March 19, 1931, when Joseph M. Boyd told him that the Boyd Company was in financial difficulty and would have to make an assignment, and that they had sold all of the Beecroft Company bonds although $219,000 was still due for Orpheum 1sts.

During all of those transactions, the directors of the Boyd Company were Joseph M. Boyd, who was also its president; the plaintiff in error Rogers, who was also its vice-president and its attorney at law; the plaintiff in error Kropf, who was its secretary and treasurer; the plaintiff in error Farness, who was its assistant secretary; Loretta Quam, who was also its assistant secretary; Stanley Boyd, who resided in New York, and C. A. Harper. The board of directors of the Boyd Company held meetings regularly. By resolution adopted at a meeting on October 22, 1928, at which Boyd, Rogers, Harper, Kropf, Farness, and Miss Quam were present, the directors authorized a mortgage of $50,000 upon the property of the company. On June 27, 1929, the directors voted that a mortgage given by W. G. Beecroft for the sum of $25,000, of which one-half represented earnings and one-half represented commissions, and which had theretofore been carried on the Boyd Company books at $250, should be credited by $12,500, thereby increasing the Boyd Company's earnings by $12,500. At a meeting of the directors on October 24, 1929, at which Boyd, Rogers, Farness, Kropf, and Miss Quam were present, the matter of

issuing preferred stock on account of the "tightness of the money market" was discussed, and the directors voted to recommend to the stockholders a $200,000 issue of preferred stock, and also voted to increase on its books the value of its business office property from $50,000 to $150,000, and to declare a one hundred per cent. stock dividend. At a meeting on November 5, 1929, at which Boyd, Harper, Kropf, Rogers, and Miss Quam were present, steps were taken to amend the articles of organization so as to permit the issue of $200,000 of preferred stock. At a meeting July 1, 1930, at which Boyd, Harper, Kropf, Farness, and Miss Quam were present, it was reported that the profits for the past quarter were under $1,000, and a two per cent. dividend was declared, payable July 1st. Like dividends were declared on April 1, 1930, and on December 5, 1930. A four per cent. dividend was declared September 27, 1929. By resolution adopted September 23, 1930, Rogers, Kropf, Farness, or Miss Quam were authorized to sign checks and drafts in their respective official capacities on the bank account of the Boyd Company, and to indorse commercial paper for deposit.

Daily statements of the assets and liabilities of the Boyd Company, as reflected by its books, were prepared every morning, and Miss Quam testified that these were submitted to the board of directors probably once in three months, or perhaps oftener. Those statements showed not only that the Boyd Company was solvent, but also that it had a surplus of $150,000. Miss Quam also testified as follows as to reports made to the board of directors with reference to the over-sales :

"On the first occasion when the oversale was mentioned, Mr. Boyd or myself said that the bonds were selling here faster than we were able to get them from the Central Trust of Illinois. In the early part of the oversale it was stated that the company was not able to furnish the bonds as fast

as we were able to sell them here. . . . At that first meeting no one expressed any great concern about the oversale, we having just sold some properties from which we would realize considerable cash, the Milwaukee properties, so no one seemed to be very much concerned about it. . . .

"At the meeting in the summer of 1930 when the oversale was discussed I believe I said we had until 1935 to pay the bonds and just by taking that on serial payments that were coming due and the cash from the sales that were about to be consummated—I am referring to the $150,000 figure in the summer of 1930. The talk of the oversale when it was $74,000, was in 1929. I believe it was in June or July, 1930, when the $150,000 figure was mentioned."

It further appears from Miss Quam's testimony that at the meeting of the board of directors held in December, 1930, it was understood "we were to make a list of the largest holders of Beecroft bonds and exchange real estate for the same. That was an effort at restitution. After the meeting in the latter part of 1930 I asked Mr. Rogers whether this was a very serious matter but he did not answer me;" that she recollected no one who disapproved of the oversale; and that each time a dividend was declared, a comparative statement or tabulation of the condition of the Boyd Company was presented, and every director had such a statement before the matter of declaring a dividend was considered.

On March 21, 1931, the stockholders and directors of the Boyd Company authorized a voluntary assignment by that corporation.

The state contends that under those facts Boyd was guilty of embezzlement in his capacity as trustee under the trust indenture. This contention is predicated upon the fact that by authenticating bonds of the Beecroft Company in violation of the provisions of article IX of that indenture, and permitting the sale thereof without receiving and applying the proceeds in accordance with the letter of March 12, 1929, he committed the crime of embezzlement. However, that

contention cannot be sustained. When Boyd as trustee authenticated the bonds in violation of the terms of the trust indenture, he did violate his duty as trustee. But that in itself worked no change in the custody of the bonds or the title thereto. The bonds were still apparently in the possession of the Boyd Company as the financial agent of the Beecroft Company, under the terms of the contract between the two companies. The Boyd Company held the $505,000 block of bonds for the benefit of the Beecroft Company; and the $395,000 block for the trustee until they were to be authenticated under the terms of the trust indenture. When Boyd, in violation of his duty as trustee, authenticated the bonds before the terms of the trust indenture had been complied with, he probably became civilly liable both to the Beecroft Company and to the holders of the other bonds, which they had bought in reliance upon the fact that the $395,000 block would not be authenticated or sold until the Orpheum 1sts had been retired, but his acts in that respect did not constitute embezzlement or conversion of the bonds to his own use or to the use of another. That the whole transaction was in fact and in legal effect between the Boyd Company and the Beecroft Company is manifest when we consider the agreements entered into between the two companies, the entries made in the bond register and the books of account of the Boyd Company, its reports of sales to the Railroad Commission, the disposition of the proceeds of the sales, and all other relevant and material facts.

As Boyd did not commit embezzlement in his capacity as trustee, there was no criminal offense committed by him in that capacity, which can be said to have been aided or abetted by plaintiffs in error. Neither can any of the plaintiffs in error be held criminally liable on the theory that he was an accessory before the fact, or that he aided or abetted the Boyd Company in its commission of a felony by its fraud-

ulent conversion or embezzlement of the proceeds of the sale of the unauthorized bonds. The amounts charged to have been embezzled exceed in each instance $100. The penalty prescribed by statute (sec. 343.20) when the amount embezzled exceeds $100, is imprisonment in state prison, with no alternative punishment by fine. Under the statutes of this state criminal liability for being an accessory before the fact (sec. 353.06, Stats.) or after the fact (sec. 353.08, Stats.), or for aiding in the commission of an offense (sec. 353.05, Stats.), results only when the offense committed by the principal felon constitutes a felony. The term "felony," when used in any statute, is defined in sec. 353.31, Stats., "to mean an offense for which the offender, on conviction, shall be liable by law to be punished by imprisonment in a state prison." As a consequence of that definition, acts or conduct on the part of a corporation which, if committed by an individual, would render him guilty of a felony, do not, as a matter of law, constitute such a crime on the part of the corporation, because its nature is such that it cannot as an offender be subjected to punishment "by imprisonment in a state prison." Although it is now well established that a corporation can be held guilty of crime when it is punishable by a fine (*United States v. Union Supply Co.* 215 U. S. 50, 30 Sup. Ct. 15, 54 Lawy. Ed. 87; *People v. Canadian Fur Trappers' Corp.* 248 N. Y. 159, 161 N. E. 455; *People v. Detroit White Lead Works,* 82 Mich. 471, 46 N. W. 735, 9 L. R. A. 722; *Overland Cotton Mill Co. v. People,* 32 Colo. 263, 75 Pac. 924, 105 Am. St. Rep. 74; *W. H. Small & Co. v. Comm.* 134 Ky. 272, 120 S. W. 361; *American Fork City v. Charlier,* 43 Utah, 231, 134 Pac. 739; *United States v. John Kelso Co.* 86 Fed. 304), it has been repeatedly held that when the only punishment prescribed for an offense is imprisonment, which cannot in the nature of things be inflicted upon it, no information or indictment will lie against it because the law does not permit or require that which is

futile. *Hawke v. E. Hulton & Co. Inc.* [1909] 2 K. B. 93; *State v. Seattle Nat. Bank,* 130 Wash. 69, 226 Pac. 259, 33 A. L. R. 1206; 7 Thompson on Corporations (3d ed.) sec. 5605, p. 610; 10 Fletcher, Cyc. Corporations, p. 659, § 4946; 7 Ruling Case Law, p. 768. The only reported cases to the contrary which an extended search has disclosed are two *nisi prius* court cases, *United States v. Van Schaick,* 134 Fed. 592, 602; *United States v. Young & Holland Co.* 170 Fed. 110, and the case of *Union Colliery Co. v. Reg.* 31 Can. Sup. Ct. 81, 2 British Rul. Cas. 222.

However, there remains the question whether—although the record may not, as a matter of fact or of law, admit of finding that the plaintiffs in error were guilty of aiding either the Boyd Company or Boyd, in his capacity as trustee under the trust indenture, in committing the crime of embezzlement—the facts inferable under the evidence admit of finding that any of the plaintiffs in error, as an officer or employee of the Boyd Company, committed, as a principal, any crime in violation of sec. 343.20, or any law of this state. As was said in 21 Am. & Eng. Ency. of Law (2d ed.) 896:

"Officers, directors, or agents of a corporation participating in a violation of law in the conduct of the company's business may be held criminally liable individually therefor."

So in a note in 33 A. L. R. 787 it is said:

"There is no dissent in the decisions which have passed on the question, from the conclusion that an officer or employee of a corporation may be held criminally responsible for the embezzlement or larceny of the property of a third person through a corporate act, where the act was done by the individual officer, at his direction, or by his permission." Citing *Milbrath v. State* (1909) 138 Wis. 354, 131 Am. St. Rep. 1012, 120 N. W. 252; *Comm. v. Moore* (1896) 166 Mass. 513, 44 N. E. 612; *People v. Sherman* (1892) 133 N. Y. 349, 31 N. E. 107, affirming (1891) 61 Hun, 623, 16 N. Y. Supp. 782; *Brown v. State* (1914) 3 Ohio App. 52, 21 Ohio Cir. Ct. N, s, 545; *State v. Ross* (1909) 55

Oreg. 450, 104 Pac. 596, 106 Pac. 1022, 42 L. R. A. N. S. 601; *Truslow v. State* (1895) 95 Tenn. 189, 31 S. W. 987; *State v. Thomas,* 123 Wash. 299, 212 Pac. 253, 33 A. L. R. 781.

Sec. 343.20, Stats., so far as here material, provides:

"Any officer, . . . of any . . . corporation, . . . or in the service or employment thereof, who, by virtue of such office or employment, . . . shall be intrusted with the . . . disbursement, investment or payment of any money or fund, or with the . . . sale, . . . of any . . . property or thing which is the subject of larceny, belonging to or under the care or control of . . . such . . . corporation, . . . shall embezzle or fraudulently convert to his own use or to the use of any other person except the owner thereof, . . . shall be punished, . . . ."

Under those provisions, an officer of a corporation may be criminally liable when any money or funds with the disbursement or payment of which he has been intrusted, whether they are merely under the control of or belong to such corporation, are embezzled or fraudulently converted by him to the use of any person other than the owner thereof.

As already indicated, Boyd as trustee was not guilty of embezzlement in authenticating the unauthorized bonds, although that was in violation of the trust indenture. Likewise, the Boyd Company was not guilty of conversion in the mere act of selling those bonds because in making the sales it acted as agent of the Beecroft Company and had been given at least apparent authority to sell the bonds. The mere fact that it did so prior to the time that it was to dispose of them under the terms of the contract of agency, in that it sold them more rapidly than the Central Trust Company succeeded in taking up the Orpheum 1sts, did not amount to a conversion. Although the Beecroft Company was deprived of the title to the bonds by such sales, the title to the proceeds thereof was still in that company. After the sale, as well as before, the relation existing between the

Boyd Company and the Beecroft Company was that of principal and agent, and not solely that of debtor and creditor. It is not necessary to consider, because it does not arise in this case, whether or not a mere intermingling of the proceeds, derived from those sales of unauthorized bonds, with other funds belonging to the Boyd Company amounted to a conversion. However, there was certainly conversion of the proceeds, which had thus become intrusted to the Boyd Company when, without any authority so to do, it appropriated those proceeds to its own use. By that unauthorized appropriation the Beecroft Company was deprived of the title to those proceeds which belonged to it under the contract. From March, 1929, to March, 1931, those misappropriations by the Boyd Company of funds belonging to the Beecroft Company exceeded $200,000. Who prescribed the course of business, or performed or authorized the acts which resulted in the wrongful and unlawful conversion of those proceeds to the use of the Boyd Company? Can it be inferred under the evidence that there was such participation on the part of the plaintiffs in error or any of them, in the course of their acts or conduct as officers of the Boyd Company, in respect to that unlawful conversion by that corporation, as would warrant an examining magistrate to find that there was probable cause to believe that they participated in the commission of a criminal offense under sec. 343.20, Stats.?

Under the provisions quoted above from sec. 343.20, Stats., any officer of a corporation, who by virtue of such office was intrusted with the disbursement, or payment of any money or fund, whether belonging to or under the control of such corporation, who shall fraudulently convert such money or fund to the use of any person other than the owner thereof, is guilty of the crime of embezzlement. It is obvious that the only manner in which the Boyd Company could act was by and through its officers, agents, or employees, acting for it and on its behalf, in relation to its stock, property,

affairs and business, which sec. 180.13, Stats., prescribes "shall be under the care of and shall be managed by a board of directors."

Among the enumerated corporate purposes of the Boyd Company was that of "acting as agent and personal representative for the care, custody, safe-keeping and handling of real and personal property and the buying, selling, exchanging and dealing in bonds, stocks, bills of exchange, notes, mortgages, lands, buildings, and all other kinds of real and personal property." Its articles of organization provided that the principal duties of the vice-president were to discharge the duties of the president in the event of the absence or disability for any cause whatever of the president; the secretary was charged with the duty of keeping records of the corporation; and the treasurer was required to keep an account of all moneys and proper vouchers for moneys disbursed, and "generally of all matters pertaining to the office as shall be required by the board of directors." However, in the final analysis, under the statutes and articles of organization, the disbursement of funds, which had been received by the corporation, was under the control and management of its board of directors. They, as a matter of law, were intrusted with and upon them rested the responsibility for the proper disbursement of all of such funds, whether they belonged to or were under the control of the corporation, and that responsibility included the prevention of the wrongful conversion of any part thereof, by prompt and effective action of the board, in so far as the directors had or were chargeable with knowledge thereof. Because they as directors had that controlling power and responsibility, whatever was done by subordinate officers, agents, or employees of the corporation, in the usual and ordinary course of its business or affairs, after the directors had knowledge thereof, or were chargeable with such knowledge, may be deemed to have

been done with the approval or at the direction of the board of directors, either expressly or by necessary implication by way of acquiescence. Corporate officers charged in law with affirmative official responsibility in the management and control of the corporate business cannot avoid personal liability for wrongs committed by claiming that they did not authorize and direct that which was done in the regular course of that business, with their knowledge and with their consent or approval, or such acquiescence on their part as warrants inferring such consent or approval. That is the rule as to civil liability on their part.

In *Salmon v. Richardson,* 30 Conn. 360, 373, the court said:

"Directors of a corporation in the management of its affairs are the power which gives expression to its will, but it is no part of their duty to perpetrate crimes or frauds in its name or for its benefit, and whatever the liability of the corporation may be, the individuals who under cover of their office of directors commit frauds like those charged against these defendants ought to be, and in our judgment are, upon the clearest principles of law and justice, accountable for their conduct in a civil action at the suit of the injured party. . . . It may sometimes be difficult to prove the actual participation of individual directors in the acts complained of, but the legal principle which subjects them when discovered is not affected by such contingency."

In *Nunnelly v. Southern Iron Co.* 94 Tenn. 397, 29 S. W. 361, the court said:

"To permit an agent of a corporation in carrying on its business to inflict wrong and injury upon others and then shield himself from liability behind his vicarious character, would often both sanction and encourage the perpetration of flagrant and wanton injuries by agents of insolvent and irresponsible corporations."

That principle is applicable to directors, officers, and agents of a corporation when funds intrusted to it have been

converted, even though they were used for the benefit of the corporation and not the officers concerned. In *Vujacich v. Southern Commercial Co.* 21 Cal. App. 439, 443, 132 Pac. 80, 81, the court said:

"Where the business of receiving deposits by a corporation is so general as it was with the corporation defendant herein, it must be presumed that the directors had full knowledge of the manner in which such moneys were kept or used, and unless a showing is made of some excuse, such as a protest offered by the director not consenting to the misappropriation and of steps taken by such director to prevent loss from accruing to the depositors, such director becomes personally liable to the depositors damaged."

In *Dollar v. Lockney Supply Co.* (Tex. Civ. App.) 164 S. W. 1076, the court said:

"We think it may be stated as the rule that managing agents of a corporation, whether they be directors or trustees, mingling money collected for another with the funds of that institution, in violation of the instruction of the owner, or who knowingly permit their subordinates to do so, and the fund is thereby lost, such managing officer will be personally liable therefor. (Citations.) . . . We think from the authorities in this state as well as others cited, that if the directors knowingly appropriated the proceeds of the cotton to the use of the corporation, or knowingly permitted the corporation to do so, or if the facts and circumstances were such as to charge them with knowledge of such appropriation, they and the corporation would be jointly and severally liable."

See, also, *Bird v. Magowan* (N. J. Ch.) 43 Atl. 278; *Virginia-Carolina Chemical Co. v. Floyd,* 158 N. C. 455, 74 S. E. 465; *Cone v. United Fruit Growers' Asso.* 171 N. C. 530, 88 S. E. 860. However, it must be noted that such liability does not result when the officer had no knowledge of, or opportunity to discover, the conversion. So in *Cone v. United Fruit Growers' Asso., supra,* the court, after holding that "the officers in control of the fund who have knowingly

participated in the wrong may be held individually liable," said as to other officers:

"We are unable to see in the record any testimony that the other directors . . . had any knowledge of the alleged misappropriation of this money or had any fair opportunity to discover it, and, as now advised, the order of nonsuit as to them is confirmed."

In the absence of such knowledge there is, of course, neither criminal nor civil liability for a wrong of that character. *Christner v. State,* 37 Okla. Crim. 95, 257 Pac. 330; *State v. Viviano* (Mo. App.) 206 S. W. 235; *United States v. Winslow,* 195 Fed. 578, 581; *State v. Carmean,* 126 Iowa, 291, 102 N. W. 97; *Caldwell v. State,* 164 Tenn. 325, 48 S. W. (2d) 1087.

In this connection it may be noted that it has been held that a corporate officer is not chargeable solely by reason of his official supervisory powers, with knowledge of the entries in corporate books of account. He is only chargeable with such knowledge, by reason of such entries, to the extent that he in fact knew of such entries, as, for instance, because they were made by him, or at his direction by others acting under his supervision or control or because they were brought to his attention. So, in *Rudd v. Robinson,* 126 N. Y. 113, 26 N. E. 1046, 12 L. R. A. 473, 22 Am. St. Rep. 816, the court said:

"There was no proof that the defendant (a director) had actual knowledge of the entries, unless he is chargeable with such knowledge from the mere fact that he was a stockholder and trustee of the corporation. There is no rule of law which charges a director or stockholder of a corporation with actual knowledge of its business transactions merely because he is such director or stockholder. In this case the broad claim is made that in an action by a corporation against one of its members to enforce a personal liability of the members of the corporation, its books are competent evidence against him to show the condition of the accounts between him and

it, and to establish the extent of his liability to it upon their simple production, and proof that they are the books of the corporation, kept as such by its officers and agents. . . . As to the competency of such books, directors and stockholders of a corporation stand upon the same footing. It is quite true that a director stands in a more favorable position to know what is going on within the corporation, and to be more familiar with its books in some cases, than a stockholder. He has the right to inspect the books of the corporation, and so has the stockholder. A stockholder having the ability is just as able to become familiar with the contents of the books of a corporation to which he belongs as a director, and there is no principle of law by which a director can be charged with knowledge of the entries in the books of a corporation which is not equally applicable to its stockholders. It is frequently easier to charge a director with knowledge of the books than it is to charge a stockholder, because he usually has an active part in the management of the corporation; but, as a general rule, many directors in corporations are just as ignorant, and necessarily so, of the particular accounts contained in its books as the stockholders are. It would be quite a dangerous, and we think startling, proposition to hold that a clerk or other officer in a business corporation could enter charges in its books of account against a director or stockholder which could be proved in favor of the corporation by the mere production of the books, thus throwing upon him, or his personal representatives after his death, the burden of explaining the entries or showing them to be untrue, and we believe the doctrine has no support in principle or authority."

That rule was followed in *Arnold v. United States,* 7 Fed. (2d) 867 (C. C. A.); *Preeman v. United States,* 244 Fed. 1 (C. C. A.); *Worden v. United States,* 204 Fed. 1, 9, 122 C. C. A. 315; *Bettman v. United States,* 224 Fed. 819, 140 C. C. A. 265; *State v. Carmean, supra; State v. Ames,* 119 Iowa, 680, 94 N. W. 231; *People v. Baff,* 99 Misc. 684, 166 N. Y. Supp. 136; *People v. Blackman,* 127 Cal. 248, 59 Pac. 573; *People v. Doble,* 203 Cal. 510, 265 Pac. 184, 186; *People v. Rowland,* 12 Cal. App. 6, 106 Pac. 428; *State v. McFarlin,* 41 Nev. 486, 172 Pac. 371. The nearest approach

to that proposition, in decisions of this court, seems to be the following statements in relation to the knowledge chargeable to stockholders: In *Rogers v. Rosenfeld,* 158 Wis. 285, 293, 149 N. W. 33, this court said that "as between the members of a private corporation, the corporate books relating to the assets, organization, liabilities, and business affairs of the corporation are treated as a public record and have the same competency as evidence."

In *Miley v. Heaney,* 168 Wis. 58, 86, 169 N. W. 64, this court said:

"We know of no principle of law which charges stockholders with knowledge of the contents of or entries in the ordinary financial books of account of a corporation."

That as to plaintiffs in error there existed such knowledge and acquiescence on their part in regard to the wrongful conversion as to render them civilly and criminally liable therefor, as participants, may be inferred from the following facts as to the methods employed which resulted in the conversion: Funds received by the Boyd Company were on deposit in banks and disbursed by checks drawn upon those deposits. From time to time those checks were issued by persons authorized to sign them by resolution of the board of directors, and apparently at the instance of the managing officers or in accordance with the established course of the company's business. Funds which might be properly considered as trust funds do not appear to have been segregated, but all the funds whether belonging to the company or to third parties were intermingled in a common account or accounts. In the course of the company's business in the period which commenced with the sale of unauthorized bonds and continued until shortly before it became insolvent, the total funds on deposit to the credit of the company were at all times very much less than the amount which was due and owing to the Beecroft Company on the bond account. While under the arrangement the Boyd Com-

pany was in duty bound to disburse that fund to retire Orpheum 1sts, the title to it was in the Beecroft Company subject to the use of the fund for the special, specified purpose for the benefit of that company. True, there is no evidence that any officer expressly said, in substance: "I will now, for the Boyd Company, take some of the funds derived from the sale of the unauthorized bonds and apply them to the corporate uses of that company." However, it does appear that the members of the board of directors, including the three plaintiffs in error here, were informed from time to time of the fact that there was an oversale; that funds received therefor were being disbursed for Boyd Company purposes; and that upon at least one such occasion, when the plaintiffs in error were present, the ability of the Boyd Company to repay those funds was discussed. Certainly then, if not theretofore, the plaintiffs in error knew that the funds derived from the sale of unauthorized bonds, and belonging to the Beecroft Company, were being converted to the use of the Boyd Company in the usual and ordinary course of its business. In addition, there is the evidence that on one occasion when those matters were discussed at a directors' meeting Rogers said to Boyd in relation to those oversales and funds, "You cannot do that;" and that on another such occasion when he was asked by Miss Quam whether "this was a very serious matter," he did not answer her question. Nevertheless, the records of the meetings of the board of directors disclose no effort whatsoever to change that wrongful course of business, or to do anything to halt the further unlawful conversion of those funds. In view of those circumstances, it was within the province of the examining magistrate to find that there was probable cause to believe that the defendants had participated in the fraudulent conversion.

The question under consideration is not whether the plaintiffs in error were aiders and abettors. Cases involv-

ing guilt on account of aiding and abetting—especially where crimes of violence were involved—are not in point. It is true that in such cases it is generally held that in order to render one liable as a participant there must be something more than a mere standing by, or a mere failure to attempt to prevent the commission of a crime. But here we are considering the duty of a corporate officer who is charged as a member of the board of directors, with the care and control of the business and affairs of the corporation, including all funds intrusted to it in the course of that business and in respect to its corporate affairs, in an endeavor to determine whether or not he participated in the doing or fulfilment of the corporate acts which constituted the conversion. Although under such circumstances, criminal responsibility is not imposed upon a director merely because he failed to exercise care and prudence, there is sufficient participation when there is an act or omission on his part, which logically leads to the inference that he has had a share in the wrongful acts of the corporation which constitute the offense. There must be, at least, evidence from which acquiescence, if not active aid, may be inferred. (Concurring opinion in *People v. Mancuso*, 255 N. Y. 463, 175 N. E. 177, 184.) Such acquiescence is inferable in the cases at bar, from the evidence as to reports made at directors' meetings in relation to the oversales and the prospects of restoring the proceeds of such sales, and as to the omission of the directors to prevent such conversions thereafter by changing that course of business. Evidence which admits finding that there was such participation on the part of the plaintiffs in error, is sufficient to support finding them guilty, not merely as aiders and abettors, but as principals under the provisions of sec. 343.20, Stats.

That conclusion is in accord with the decision in *State v. Ross,* 55 Oreg. 450, 104 Pac. 596, 106 Pac. 1022, 42 L. R. A. N, s. 601, which is probably the leading case upon this

question in this country.   An Oregon statute (B. & C. Comp. § 1807) provided:

"If any person shall receive any money whatever for this state, . . . or shall have in his possession any money whatever belonging to such state, . . . and shall in any way convert to his own use any portion thereof, . . . such person shall be deemed guilty of larceny. . . ."

Ross was the president and a director of the Title Guaranty & Trust Company, which received a deposit of state funds.   In the ordinary course of the company's business those state funds were wrongfully paid out by the company for other purposes than those of the state.   Ross contended that the money was not converted to his own use; that the money was in the possession of the trust company and not of Ross; and that, if there was a conversion, it was by the trust company and not by Ross.   In response to those contentions the court said:

"The trust company is a corporation, an intangible thing, existing only in contemplation of law, a collection of individuals authorized to act as if they were one.   The individuals are its component parts, and the existence of a corporation independently of its stockholders is a fiction.   Its rights and duties are the rights and duties of the persons composing it.   (Citing cases.)  . . .  If the officers and directors of a corporation join in a criminal act, as a corporate act, they are jointly liable with the corporation, if it is an act for which the corporation may be prosecuted; and if it is a felony, the directors and officers are individually liable. It is their criminal act and not that of the corporation." (Citing cases.)

Ross further contended that under the statute he was not authorized to receive state money and therefore it could not have been in his possession.   In response to that the court said:

"Under the act of 1907 the trust company was made an active depository, and therefore authorized to receive it.

This it could only do by the hands of its officers; and if it was a violation of the statute for the trust company to convert the money, it was equally so for any one who did the act for it, or authorized it."

Recognizing the well established rule that only corporate officers who participate in the commission of the offense can be held criminally liable, the court said:

"There is no evidence in this transcript tending to show that Ross actually paid out for the trust company any of its money or expressly authorized any one to do so. There is no doubt that if the money had been embezzled from the trust company, or applied in any way not intended by the company, or not for its benefit, by any subordinate, then Ross could not be held criminally liable unless he participated in such diversion thereof, but that is not this case. The record tends to show that the money was in the general deposit funds of the trust company and was paid out in the usual way in payment of legitimate claims against the trust company; that is, in the manner contemplated and intended by the company and those in direction of its affairs. The agents actually paying out the money had a right to understand that this was to be done, there being no segregation of the money or limitation on the use of it. . . . When the money was received by the company as an active depository, and its directors and officers permitted the money to become a part of the general deposit of the company, without restriction thereon, with knowledge that in so doing the money would be applied to the trust company's general uses, this was general authority to subordinates to pay it out in the usual course of the business, and these officers and directors are liable therefor."

The same problem was involved in *State v. Parker,* 112 Conn. 39, 151 Atl. 325. Although on account of the peculiar form of the Connecticut statute under which Parker was informed against, the conviction could not be sustained under the facts of the case, the court said:

"It also has been held that an officer of a corporation may be held criminally responsible for embezzlement of the

property of a third person through a corporate act, where the act was done by the officer, or at his direction, or by his permission. . . ."

In *Caldwell v. State,* 164 Tenn. 325, 48 S. W. (2d) 1087, Caldwell was charged with having taken certain bonds from the custody of the Bank of Tennessee and transferred them to Caldwell & Company in violation of the terms of a trust and converted them to the use of Caldwell & Company. He was president of both corporations. The evidence is recited at considerable length in the opinion, but it appears that the defendant did not perform the act which resulted in the transfer and conversion of the bonds nor did it appear that he knew they were taken until after it was done. The court said:

"His criminal responsibility would depend upon whether or not the Hardeman bonds were fraudulently taken from the trust and appropriated to the use of Caldwell & Co. pursuant to a general corporate scheme or plan designed and used by the defendant for that purpose through other corporate officers acting under his general direction. If the appropriation was so made through the instrumentality of the corporate organization by defendant's general direction or pursuant to a scheme or plan devised by him with the intent to accomplish the criminal result, he would be equally guilty with the other employees of the corporation who actually made the misappropriation."

In *State v. Thomas,* 123 Wash. 299, 212 Pac. 253, 33 A. L. R. 781, it was held that a president, who is a general manager of the corporation, engaged in lending money and selling securities, is guilty of larceny if he participates in a transaction by which money due on a security which has been sold to a client, is placed to the credit of the corporation's bank account when it is paid by the borrower at a time when the corporation is in financial difficulty so that the money is lost to the client. The defendant contended that

he was not criminally liable because he acted for the corporation. The court said:

'"The appellant cannot escape liability for the act of the corporation. He directly participated in the transaction which resulted in the money which was paid in for Hunt, being placed in the account of the corporation with its bank. He knew at this time that the corporation was in financial difficulties, that the bank account was needing money, and that the bank had refused to make further advancements. It is true that the money was not paid in to him individually, but came in through an employee of the corporation, who, acting under the general direction of the appellant and in accordance with the general policy of the company in handling such matters, deposited the same in the corporation's account."

It is, however, contended that under the doctrine announced in *Weber v. State,* 190 Wis. 257, 208 N. W. 923, and followed and approved in *Kralovetz v. State,* 191 Wis. 374, 211 N. W. 277, the plaintiffs in error cannot be held to be guilty of participation. In *Kralovetz v. State, supra,* it was said:

"Both the *Weber Case* and the case at bar arose out of business transacted by the same security company. While the defendants in each of these cases were officers of the same company in name, each served the company in fact as a mere employee who carried out the instructions of a superior officer in most of the services performed by him. The stock of the company held by each defendant consisted merely of qualifying shares. Each received a monthly salary of $150. Each was acting for the company when he received the money that was converted. In each case the receipt for the money was given in the name of the security company and the money was placed to the credit of the company and was used by the company. Neither defendant profited personally by the conversion of the money by the company."

What the court held in those cases was that under the facts of those cases, including the limitations on the de-

fendants' authority, there was no participation by them in the conversion. So in the *Weber Case, supra,* it was said:

"He did not control the corporation or the board of directors. Misappropriation of the moneys derived from Failley did not advance his personal interests. While an officer in name, he served the corporation in fact as a mere employee. In the instant case there is not even an intimation in the record that the company was insolvent when it received the $2,000 from Failley."

The position of the defendants in those cases was analogous to that of a clerk or employee of the Boyd Company, who, in the general course of the company's business, may have accepted deposits and, upon direction of a superior officer, may have drawn or even signed checks. Responsibility for corporate acts rests with those who have the power to authorize and control such acts and not with those who without knowledge of the fraud, upon the authorization of the corporation and at the direction of a superior officer, perform the physical acts which may result in conversion.

The application of the rule is well illustrated in *State v. Carmean,* 126 Iowa, 291, 102 N. W. 97. Carmean was charged with embezzlement. Certain moneys had been received by the corporation of which he was president that should have been used to retire obligations of a third party but were left in the hands of the corporation which subsequently failed, whereby the depositor was compelled to make good the loss. It appears that the president had no personal knowledge of the transaction. The court said:

"In order that defendant shall be held liable for so planning and conducting the business of the company as to result in fraudulent misappropriation or conversion of the money of Roemer & Miller intrusted to the corporation, it must, we think, be charged and shown that such course of business was either in its essential characteristics illegal,

and devised and carried on for the purpose of effecting a criminal result; or that, with the knowledge and under the direction of defendant, it was so carried on in a particular case as to effect such result."

Because the defendant was not chargeable, under the facts in that case, with knowledge of or participation in the conversion, the court held that he was not guilty. Under those circumstances an acquittal was, of course, proper; and the decisions in many of the cases, hereinbefore cited, are likewise to that effect.

However, as in the cases at bar there is evidence that, although it was expressly brought to the attention of plaintiffs in error, as directors, that funds belonging to the Beecroft Company were being converted to the use of the Boyd Company in the course of its business, it can properly be inferred that the plaintiffs in error, by permitting that wrongful course of business to continue, acquiesced therein—at least as to the subsequent conversions. There was sufficient evidence of participation on their part to warrant the finding of probable cause which was made by the examining magistrate. Even though there was an intention on the part of those responsible for the fraudulent conversion to replace the funds, the offense is nevertheless embezzlement. *Glasheen v. State,* 188 Wis. 268, 205 N. W. 820; *State v. Kuenzli,* 212 Wis. 296, 249 N. W. 511. Likewise, even where full restitution is made, the offender is not released from prosecution and punishment for the offense. *State ex rel. Shea v. Evenson,* 159 Wis. 623, 150 N. W. 984.

It follows that the judgments appealed from must be affirmed. However, the plaintiffs in error should not be informed against as aiders and abettors. If there is any criminal liability at all on their part for embezzlement, it is as principals and not as aiders and abettors.

They were also held for trial by the examining magistrate on two counts in the complaint which charged them with violating the Blue Sky Law in two respects:

First, that they "did authorize, direct, aid in and consent to the issue and sale of part of the $900,000 of bonds knowing said issue and sale to be in non-conformity with the representations made to the Public Service Commission in securing the permit for the sale of said bonds, violating sec. 189.23 (2) (b) by not complying with that part of the representation . . . which required the holding in trust bonds . . . or proceeds sufficient to redeem prior first-mortgage liens. . . ."

Second, that plaintiffs in error "did . . . apply and cause and assist to be applied part of the proceeds (of the $900,000 bond issue) to a purpose which they knew to be contrary to the representations made in the application for the permit to the Public Service Commission, said violation consisting of the diversion of the proceeds of said bonds which were held exclusively for the redemption of prior first-mortgage lien bonds, contrary to sec. 189.23 (2) (f)."

To constitute an offense in violation of sec. 189.23 (2) (b), there must be some showing which admits of finding that the accused did authorize, direct, aid in, or consent to the issue and sale in non-conformity with the representations; and to constitute an offense in violation of sec. 189.23 (2) (f) there must be proof which admits of finding that the accused did apply or cause to be applied or assist in applying part of the proceeds contrary to the representations.

Evidence from which active participation on the part of the plaintiffs in error in the commission of the acts or conduct which constitute the gist of the offenses defined in secs. 189.23 (2) (b) and 189.23 (2) (f) is inferable, is, of course, likewise necessary to hold them for trial on such charges. However, again sufficient basis for such inferences is afforded by the evidence as to matters which were brought to the attention of plaintiffs in error, as hereinbefore discussed, including, particularly, the repeated reports at directors' meetings as to the oversales of unauthor-

ized bonds, and the prospects of the Boyd Company's repaying the misappropriated proceeds of such sales.

The plaintiff in error Kropf was also held for trial on a count which charged that he, in violation of sec. 189.15 (5), 189.23 (2) (h), did give a written representation as to Class A securities which referred to the security being authorized, passed and classified by the Securities Division of the Railroad Commission as Class A security, without having printed, written, or designated upon such printed representation this clause, "passed by the Railroad Commission of Wisconsin but without recommendation as to value." Sec. 189.15 (5) prohibits the issuance by any person of "any advertisement, prospectus or other printed or written representation as to . . . Class A securities, which refers to the security being authorized, passed or classified by the Railroad Commission as Class A securities, shall contain this clause: 'Passed by the Railroad Commission of Wisconsin but without recommendation as to value.'"

It is apparent on the face of that statute that it relates only to some printed or written matter or representation relating to Class A securities, "which refers to the security being authorized, passed, or classified by the Public Service Commission." It is not made applicable when such matter or representation does not by words of reference refer to such action by the commission. The only written representation shown on the preliminary examination to have been made, is a letter written by Kropf in which he said "the bonds are Class A securities and are qualified for the investment of trust funds." That representation did not mention or refer to the commission at all, and certainly did not refer to the security as having been authorized, passed, or classified by the commission. There may be said to be an implication to that effect, but it certainly did not refer to that fact, and unless that is done, there is no violation of sec. 189.15 (5).

*By the Court.*—Orders affirmed.